BLUE CROSS AND BLUE SHIELD OF VIRGINIA

V.

KATHARINE KELLER

Record No. 931668

November 4, 1994

Present: All the Justices

C. Richard Cranwell (James E. Buchholtz; H. Keith Moore; Cranwell & Moore, on brief), for appellant.

Clifford L. Harrison (Edwin C. Stone; Stone, Harrison, Turk & Showalter, on brief), for appellee.

JUSTICE KEENAN delivered the opinion of the Court.

The dispositive issue in this appeal is whether the trial court erred in refusing to strike the evidence and in submitting to the jury the issue whether Blue Cross and Blue Shield of Virginia (Blue Cross) employed an unreasonable procedure when it denied coverage for a portion of a patient's stay at a psychiatric hospital.

Blue Cross provided a group plan of health care insurance (the policy) to the Commonwealth of Virginia for the benefit of the Commonwealth's employees, retirees, and their eligible family members. Katharine K. Keller was a family member eligible for benefits under this plan. Beginning in 1982, Keller had been treated for clinical depression by Dr. Orren L. Royal, a psychia-

trist on the staff of Saint Albans Psychiatric Hospital. From 1984 to 1990, Dr. Royal treated Keller for this condition on an outpatient basis.

On June 8, 1990, Dr. Royal admitted Keller to Saint Albans Hospital as an inpatient. Dr. Royal testified that Keller had become profoundly depressed, and that he decided hospitalization was appropriate because he thought there was a "very distinct possibility" that she would commit suicide. Keller remained at Saint Albans Hospital from June 8 through September 28, 1990.

The Blue Cross policy provided Keller with coverage for 120 days of inpatient hospital care for psychiatric or other conditions per calendar year. However, the policy stipulated that benefits would not be provided for "[a]ny service determined to be not Medically Necessary by the Plan, in its sole discretion, for the treatment of an illness, injury, or pregnancy-related condition." The policy further provided, "In all cases, benefits will be denied if the Plan determines, in its sole discretion, that care is not Medically Necessary."*

Blue Cross approved Keller's admission and hospitalization through August 1, 1990. However, Blue Cross refused to pay benefits for the remaining term of her hospitalization, based on its determination that further inpatient care was not medically necessary. Thereafter, Keller filed a motion for judgment against Blue Cross alleging breach of its insurance contract.

At trial, Keller testified that, beginning in early 1990, she experienced a period of severe depression. She left graduate school and a teaching job, suffered insomnia and weight loss, and was unable to attend to daily activities. She had feelings of despair and worthlessness and was obsessed by thoughts of killing herself. On one occasion, she stayed away from her home overnight, planning to take an overdose of some pills she had brought with her. Although she decided not to carry out her plan at that time, her

---

* The policy defined the term "Medically Necessary," in part, as follows:

A Medically Necessary service is one required to identify or treat an illness, injury, or pregnancy-related condition which a Provider has diagnosed or reasonably suspects. To be Medically Necessary, *the service must*:

- be consistent with the diagnosis of your condition;
- be in accordance with standards of good medical practice;
- not be for the convenience of the patient, the patient's family, or the Provider; *and*
- be performed in the least costly setting required by your medical condition.

condition did not improve. On June 8, 1990, Keller's husband arranged an emergency consultation with Dr. Royal, at which time Dr. Royal admitted Keller to Saint Albans.

Dr. Royal testified that he had diagnosed Keller's condition as "major depression," and that her illness was recurrent and severe. Dr. Royal also made an additional diagnosis of "borderline personality organization."

The record of Keller's hospitalization at Saint Albans included Dr. Royal's notes on July 23 and 24, 1990, that Keller was anxious and frightened at the possibility of leaving the hospital. In addition, a nurse's note showed that, on September 8, 1990, Keller told the nurse that she had planned to "harm herself" by "opening up a vein" with nail clippers while on a walk alone around the hospital grounds, but that she then realized those thoughts were wrong.

Dr. Royal's entries in the record showed that he evaluated Keller's condition as generally negative from September 8, 1990 through September 21, 1990. Thereafter, Keller began to improve, due to therapy and a change in medication, until she was finally discharged on September 28, 1990. Dr. Royal testified that he believed the entire course of inpatient treatment was necessary, because during this time the risk of "self harm" was too great to allow him to treat Keller as an outpatient.

On cross-examination, Dr. Royal stated that he is opposed to medical necessity reviews in which a treating doctor's decisions about a patient's care may be questioned, because he believes that such decisions should be made solely by the treating physician and not by reviewers who have never examined the patient. He stated that he believes it is "unprofessional, almost unethical" for a reviewing psychiatrist to decide that a patient is ready to leave the hospital, when the patient may be suicidal and the psychiatrist has never seen the patient.

Counsel for Blue Cross asked Dr. Royal if he were aware that "the contract [of insurance] gives Blue Cross the right to review and make the decision on medical necessity." Dr. Royal agreed, "It gives that contractual right, but I'm speaking from a broader sense."

Ruby M. Robbins, an employee in Blue Cross' legal department, testified regarding the standard procedures followed by Blue Cross in determining whether hospitalization is deemed medically necessary. Robbins also detailed the specific steps followed by

Blue Cross in reviewing the necessity of Keller's continued hospital stay.

Robbins stated that Blue Cross relies on a list of specific criteria in evaluating the necessity of hospitalization for all adult psychiatric cases. At least one of the criteria must be met for the admission to be appropriate. The list of criteria is developed by physicians for Blue Cross and is approved by its medical review office.

Blue Cross' nurses are authorized to approve an admission, as well as the length of the stay, based on information communicated by the patient's health care provider. In certain cases, the nurses also can approve a request for an increase in the number of inpatient days authorized.

If such a request is denied, the patient's treating physician may request a "peer review" by a physician in the appropriate area of specialty, who serves as a consultant for Blue Cross. If the treating physician is dissatisfied with the result of the peer review, he or she may request an additional review by another such consulting physician.

Robbins testified that Keller's hospital stay was initially approved through June 13, 1990; it was later extended through July 16, 1990. Dr. Royal then requested peer review, and Blue Cross had the case reviewed by its consultant, Dr. Jack Durrell, a psychiatrist. After talking with Dr. Royal, Dr. Durrell approved Keller's stay only through July 19, 1990. Dr. Royal requested an additional peer review and spoke with Dr. Robert Mitchell, another consulting psychiatrist, who approved Keller's stay through July 23, 1990.

Dr. Royal again appealed this decision, and Keller's case was further reviewed by Ray Scherr, a registered psychiatric nurse on staff at Saint Albans, in consultation with another nurse who is the head of Blue Cross' medical review department. Scherr approved further hospitalization through August 1, 1990.

Thereafter, Dr. Royal made additional requests for retroactive approval of the remainder of Keller's stay ending September 28, 1990. His requests were reviewed by a third psychiatrist, Dr. C.A. Binford. Blue Cross denied the requests based on Dr. Binford's conclusion that hospitalization after August 1, 1990, was not medically necessary, because Keller could have been treated as an outpatient during that time.

After Keller began this litigation, Blue Cross obtained a further review of Keller's case by Dr. Paul Mansheim, a psychiatrist. In

addition to his psychiatric practice, Dr. Mansheim also performs review of medical records for insurance companies and other groups charged with managing health care benefits.

Dr. Mansheim testified that Keller's original admission to the hospital was medically necessary. However, he stated that the medical records did not demonstrate that acute inpatient psychiatric care after August 1, 1990, was medically necessary. He noted that the usual hospital stay for a patient with Keller's diagnosis is only 10 to 21 days, or 28 days in extreme cases. Dr. Mansheim stated that Keller's symptoms, as described in the record around August 1, 1990, could have been treated at a lower level of care, such as outpatient or daytime treatment.

In particular, Dr. Mansheim cited several of Dr. Royal's notes from late July and early August 1990, which indicated improvement in Keller's condition. Dr. Mansheim also noted that there were numerous references in the record stating that Keller had decided that suicide was not an option for her any more.

Dr. Mansheim stated that his opinion was not changed by the fact that Keller had formulated specific suicide plans both before her admission and while hospitalized on September 8, 1990. His evaluation of the record was that Keller showed improvement from the time of her admission until mid-July, when she reached a "plateau" and made no further improvement. Although she became "much worse" in September, she then improved until her discharge.

Dr. Mansheim testified that Dr. Royal's primary diagnosis of "major depression [with] melancholia, recurrent, severe," ordinarily would not warrant hospitalization. He stated that inpatient psychiatric care is justified when the patient is imminently dangerous to others; when the patient is receiving treatment such as electroshock therapy that may be hazardous or cause medical complications; or when the patient intends to commit suicide and has a specific plan to do so, which the patient has the means to carry out.

According to Dr. Mansheim, Keller's condition presented none of these justifications after August 1, 1990. In particular, he noted that the record after that date did not show that any "suicide precautions," such as maintaining Keller under close supervision, were taken.

Dr. Mansheim also testified that Dr. Royal's diagnosis of "borderline personality organization" was an additional reason against

prolonging Keller's hospitalization. He stated that a patient affected with a personality disorder "usually gets worse" in a hospital and should stay there only while "imminently suicidal." He explained that persons with personality disorders are likely to become dependent on hospitalization, and that the hospital environment deprives such patients of beneficial correctives to their behavior that are provided by everyday interaction with other persons.

Dr. Mansheim acknowledged that he had never talked to Keller or her family in connection with his review of her record, or to Dr. Royal regarding her case. He also did not discuss the case with the other psychiatrists who had reviewed the record.

Dr. Mansheim stated, however, that he believed his objectivity made him better able than Dr. Royal to assess Keller's treatment. Dr. Mansheim testified that a close relationship can develop during long-term treatment, causing a psychiatrist to lose objectivity and to find it difficult to be as "aggressive" as necessary in treating the patient. For this reason, Dr. Mansheim stated that Dr. Royal "was at [a] real disadvantage."

At the conclusion of Keller's evidence, Blue Cross made a motion to strike, which it renewed at the completion of all the evidence, on the ground that Keller had not proved a breach of the insurance contract. Blue Cross contended that the evidence showed only that Dr. Royal disagreed with Blue Cross' decision to deny hospitalization benefits, and that Keller had not shown that Blue Cross acted improperly in exercising its discretion to determine medical necessity, as provided by the policy. The trial court overruled the motion and submitted the case to the jury, which awarded judgment in favor of Keller in the amount of $30,843, for the medical expenses claimed.

On appeal, Blue Cross argues that the trial court erred in overruling its renewed motion to strike. Blue Cross contends that the contract of insurance reserved to it the right to deny benefits if, in its sole discretion, it determined that health care services were not medically necessary. Blue Cross concedes that this contract provision imposed a duty not to abuse its discretion; however, Blue Cross argues that, as a matter of law, Keller failed to prove that it breached this contractual duty.

■ In response, Keller maintains that the evidence was sufficient to present a jury question whether Blue Cross employed an "unreasonable" process in deciding the necessity of inpatient

treatment. Keller relies primarily on Dr. Royal's testimony that he found the process "unprofessional, almost unethical," and hence unreasonable. We disagree with Keller and conclude that Blue Cross' motion to strike should have been granted, because reasonable persons could not differ as to whether Blue Cross acted within its discretion under the policy.

We review the trial court's decision to deny the motion to strike in accordance with well-settled principles.

> When the sufficiency of a plaintiff's evidence is challenged by a motion to strike, the trial court should resolve any reasonable doubt as to the sufficiency of the evidence in plaintiff's favor and should grant the motion only when "it is conclusively apparent that plaintiff has proven no cause of action against defendant," or when "it plainly appears that the trial court would be compelled to set aside any verdict found for the plaintiff as being without evidence to support it."

*Williams v. Vaughan*, 214 Va. 307, 309, 199 S.E.2d 515, 517 (1973) (citations omitted).

"A jury issue exists '[i]f there is conflict of the testimony on a material point, or if reasonably fair-minded [persons] may differ as to the conclusions of fact to be drawn from the evidence, or if the conclusion is dependent on the weight to be given the testimony.' " *State Farm Mut. Auto. Ins. Co. v. Davies*, 226 Va. 310, 319, 310 S.E.2d 167, 171 (1983) (quoting *Hoover v. J.P. Neff & Son, Inc.*, 183 Va. 56, 62, 31 S.E.2d 265, 268 (1944)).

Because it possessed the contractual right to exercise its discretion, Blue Cross' decision to deny benefits to Keller could be overturned by the trial court only if the evidence showed that Blue Cross abused its discretion in arriving at that decision. When we view the evidence and all reasonable inferences deducible therefrom in the light most favorable to Keller, resolving any reasonable doubt as to the sufficiency of the evidence in her favor, we conclude, as a matter of law, that Blue Cross did not abuse its discretion.

The evidence shows that Blue Cross developed and followed well-defined criteria to be used in determining whether services were medically necessary and, in particular, whether inpatient treatment was necessary in adult psychiatric cases. In this case, Blue Cross responded to Dr. Royal's requests for further review by submitting the matter to four independent reviews, although

testimony by Robbins suggested that Blue Cross ordinarily provides only two such reviews. Moreover, the evidence showed that, on several occasions, Blue Cross approved requests that Keller's hospital stay be extended. In total, Blue Cross approved 54 days of inpatient care, although Dr. Mansheim testified that 10 to 21 days is the usual length of a psychiatric inpatient stay.

We cannot agree with Keller's contention that Dr. Royal's criticism of Blue Cross' decision to terminate benefits raised a jury question whether Blue Cross' action constituted an abuse of discretion. It was plain that Dr. Royal disagreed with Blue Cross' decision regarding the proper level of treatment, and that he believed more weight should have been given to his own opinion, based on his longstanding treatment of Keller and his ultimate responsibility for her welfare.

■ However, Dr. Royal's only specific criticism of Blue Cross' process of decision-making in Keller's case was his opinion that, because the case involved the possibility of suicide, the reviewing physicians could not make an informed decision without speaking personally with Keller. This testimony alone was not sufficient to raise an issue of fact whether Blue Cross improperly exercised its discretion, since other evidence showed that Blue Cross' determination rested, in part, upon input from Dr. Royal, who himself had a thorough acquaintance with Keller's case and was well qualified to assess her condition. In addition, Dr. Royal admitted that Blue Cross' policy gave it the contractual right to make such decisions in its discretion, and he acknowledged that his opposition to the review process was in "a broader sense."

As we frequently have stated, a court must adhere to the terms of a contract of insurance as written, if they are plain and clear and not in violation of law or inconsistent with public policy. It is not our function to "make a new contract for the parties different from that plainly intended and thus create a liability not assumed by the insurer." *Pilot Life Ins. Co. v. Crosswhite*, 206 Va. 558, 561, 145 S.E.2d 143, 145 (1965). Thus, since the evidence here failed to present a jury question whether Blue Cross abused the discretion plainly provided by the contract, the trial court erred in refusing to grant Blue Cross' motion to strike the evidence.

For these reasons, we will reverse the trial court's judgment and enter final judgment in favor of Blue Cross.

*Reversed and final judgment.*